FLANDERS + MEDEIROS
INC., Plaintiff,

v.

Elizabeth V. BOGOSIAN, Defendant.

Civ. A. No. 91–0026L.

United States District Court,
D. Rhode Island.

Nov. 14, 1994.

414

Matthew F. Medeiros, Robert Karmen, Flanders & Medeiros, Jeffrey C. Schreck, Brown, Rudnick, Freed & Gesmer, Providence, RI, Cynthia C. Smith, Eric Lund, Posternak, Blankstein & Lund, Boston, MA, for plaintiff.

Robert I. Deutsch, Chestnut Hill, MA, William Y. Chaika, Providence, RI, for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

### I. INTRODUCTION

Pursuant to Fed.R.Civ.P. 72(b) and Rule 32(c)(2) of the Local Rules of this Court, plaintiff Flanders + Medeiros, Inc., ("F + M") objects to the recommendations of United States Magistrate Judge Timothy M. Boudewyns: 1) that F + M's motion for summary judgment should be denied on its breach of contract claim as contained in the Complaint against defendant Elizabeth V. Bogosian ("Bogosian"); and 2) that the reasonableness of F + M's fees as a matter of law cannot appropriately be determined under Fed.R.Civ.P. 56(d). Bogosian objects to Magistrate Judge Boudewyns' recommendation that F + M's motion for summary judgment be granted on Bogosian's attorney malpractice counterclaim. Bogosian does not object to Magistrate Judge Boudewyns' recommendation that her cross-motion for summary judgment on F + M's breach of contract claim be denied.

After considering Magistrate Judge Boudewyns' Report and Recommendation, the parties' legal memoranda, and the relevant case law, this Court concludes that summary judgment should be granted for F + M on its breach of contract claim as contained in the Complaint. Having determined that F + M is entitled to summary judgment on its breach of contract claim, the Court determines that the outstanding balance owed to F + M by Bogosian on June 9, 1994 is $1,079,282.30, plus any interest which has accrued since that time. The Court also concludes that summary judgment should be granted for F + M on Bogosian's attorney malpractice claim as contained in Counts I and II of the Counterclaim.[1]

---

**1.** Neither F + M's Motion for Summary Judgment nor Magistrate Judge Boudewyns' Report and Recommendation differentiates between Counts I and II of Bogosian's Counterclaim. It

## II. FACTS

Plaintiff, F + M, is a law firm based in Providence, Rhode Island. Defendant, Bogosian, is a real estate developer in the southeastern New England area, formerly a citizen of Rhode Island but now a citizen of Florida. In November 1989, F + M agreed to represent Bogosian in a number of litigations which were pending before various state courts and in this Court. The suits involved numerous disputes concerning the substantial real estate holdings she had with her two brothers (the Woloohojians) through various entities. This case arose from the attorney-client relationship between F + M and Bogosian—specifically Bogosian's failure to pay F + M's legal fees and her allegation of legal malpractice on the part of F + M.

On November 24, 1989, F + M sent Bogosian a letter (the "retainer letter") setting out the terms of F + M's retention as Bogosian's counsel. The retainer letter provided, in pertinent part:

> We recognize that you may be unable to pay our monthly statements in full on an ongoing basis. To the extent that you are unable to pay those bills from other sources, you have agreed to apply your first proceeds out of the E & J receivership, the Woloohojian Realty Associates receivership, and/or the federal court litigation, until all of our outstanding bills, including any accrued interest, are paid in full. Appended to this letter as Exhibit A is an Assignment that we would ask you to execute. That assignment gives us an interest in the proceeds of those court proceedings up to the amount of our bills. It is my understanding that you have reviewed this agreement with Ted Pliakas and have found it acceptable.

Bogosian signed the retainer letter and also executed the referenced assignment agreement (the "assignment") which provided:

> To the extent that Assignor owes Assignee any money for out-of-pocket expenses and legal services rendered by Assignee in connection with said actions, Assignor hereby

---

is clear that both counts of Bogosian's Counterclaim are based on attorney malpractice; Count I sounding in tort and Count II sounding in breach of contract.

assigns to Assignee, effective as of the day and year first above written, that portion of the Recoveries[2] which is necessary to pay all of Assignee's then unpaid bills. Bogosian also executed a UCC–1 financing statement which was filed with the Rhode Island Secretary of State. Bogosian was represented by her personal counsel, Eustace T. Pliakas ("Pliakas"), when she executed the retainer letter, assignment, and financing statement.

After Bogosian signed the retainer letter on November 24, 1989, F + M entered its appearance as substitute counsel for Bogosian in a number of pending actions. Subsequently, F + M agreed to represent Bogosian in several additional lawsuits. In all, F + M represented Bogosian in approximately ten separate but related litigations.

On December 23, 1992, F + M received two checks from Woloohojian Realty Corporation ("WRC") totalling one million dollars and payable to Bogosian. The letter which accompanied the checks stated that the checks were:

a voluntary principal payment made by WRC on account of Mrs. Bogosian's former shareholder interest. This entire sum shall constitute an immediate credit toward any principal sums which may become due and owing to Mrs. Bogosian in the federal court proceeding on account of WRC's purchase of her shares and/or WRC's liquidation.

The checks themselves contained no written conditions or restrictions. It was merely noted on the checks that they were a "partial payment for stock acquisition."

F + M requested that Bogosian indorse the two checks and remit them to F + M in payment of outstanding legal fees. Bogosian refused to indorse the checks. She alleges that her refusal was based on her good faith belief that indorsing the checks would cause her adverse tax consequences. Bogosian also asserts that she believed WRC's payments were improperly designated for principal amounts owed to her by WRC rather than interest. F + M alleges that as of June 9, 1994, the total principal and interest owed to F + M by Bogosian was $1,079,282.30, and that interest has continued to accrue at Fleet National Bank's prime rate since that date.

F + M filed this action against Bogosian on January 14, 1993, alleging that Bogosian breached her agreements with F + M and that F + M is entitled to compensatory damages in the amount of its outstanding fees, plus interest, costs and attorney's fees. Additionally, F + M's complaint sought an order requiring Bogosian to indorse the two checks and pay them over to F + M.[3] On March 16, 1993, Bogosian filed an Amended Answer and Counterclaim with the Court. The Counterclaim in Count I alleged that F + M was negligent in its representation of Bogosian and committed professional malpractice.[4] The Counterclaim in Count II al-

---

2. The "Recoveries" referenced in the assignment are defined in that agreement as the sums which Bogosian anticipated she would receive in the state court receivership actions involving Woloohojian Realty Associates and E & J Realty Associates, and the federal court action involving Woloohojian Realty Corporation.

3. F + M concedes that this request is now moot because the checks expired automatically after six months and would not be honored if presented for payment.

4. Bogosian's counterclaim alleges at least thirty-four instances of malpractice by F + M. A complete recitation of her allegations is unnecessary, but they include, *inter alia:*
 (a) F + M's failure to obtain sufficient interim relief in the WRC litigation;
 (b) F + M's failure to properly supervise expert witness Eric Berenson in the appraisal proceeding before the Special Master;

(c) F + M's failure to insist on certified income and expense statements from WRC in the valuation proceeding;
(d) F + M's failure to object to the Special Master's report on the basis of, *inter alia,* the appropriateness of the comparables relied upon by the Special Master to arrive at the value of certain real estate, his valuation of WRC's management business based upon two years' management contracts, and the issue of whether there was a waterway on another site;
(e) F + M's withdrawal of its representation of Bogosian in the WRC litigation, and its failure to bring suit to enjoin Bogosian's brother from entering into unauthorized management contracts;
(f) F + M's numerous failures to take action in relation to the two receiverships; and
(g) F + M's failure to take action to have Bogosian's brother declared incapacitated and terminated as a general partner of the Section 8 limited partnerships.

leged that F + M breached its contractual obligations to Bogosian because of F + M's negligent representation of her.

A review of the discovery process in this case is pertinent to the Court's consideration of F + M's motion for summary judgment on Bogosian's malpractice counterclaim. At the pre-trial scheduling conference on March 29, 1993, this Court set a discovery closure date of September 24, 1993. On April 12, 1993, Bogosian moved to stay discovery. Her motion was denied by Magistrate Judge Boudewyns on June 14, 1993. On September 17, 1993, Bogosian moved to enlarge the time for discovery. This Court denied her motion on October 1, 1993. Finally, on October 22, 1993, Bogosian moved to continue the case and pass it from the trial calendar and to reconsider opening discovery. These motions were denied by Magistrate Judge Boudewyns on November 23, 1993. Bogosian did not serve any discovery requests of her own until September 24, 1993—the date discovery closed. She did not hire an expert witness to provide testimony necessary for her malpractice counterclaim until February, 1994, and her supplementary answers to F + M's interrogatories merely identified her expert but did not indicate the likely substance of his testimony. Apparently Bogosian's expert did not have adequate time to review the records.

F + M moved for summary judgment on its breach of contract claim in the Complaint and on Bogosian's malpractice counterclaim. Bogosian moved for summary judgment on F + M's breach of contract claim. On February 22, 1994, Magistrate Judge Boudewyns heard arguments on the parties' cross-motions for summary judgment. On April 6, 1994, Magistrate Judge Boudewyns issued a Report and Recommendation in which he urged that summary judgment be denied to both parties on the breach of contract claim as contained in the Complaint but that summary judgment be granted to F + M on Bogosian's malpractice counterclaim.

Pursuant to Fed.R.Civ.P. 72(b) and Local Rule 32(c) of this Court, both parties filed timely objections to the Magistrate's Report and Recommendation. On June 10, 1994, the Court heard oral arguments on the parties' objections and now makes a de novo determination on the summary judgment motions.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If that showing is made, the motion can then be granted if, as a matter of law, the moving party is entitled to judgment in its favor.

### B. Applicable Law

The Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1). Because the basis for the Court's jurisdiction is the diversity of citizenship of the parties, the Court must apply the substantive law of the state where it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In this case, the parties do not dispute that Rhode Island law governs their claims and counterclaims. Therefore, the Court applies Rhode Island law to F + M's motion for summary judgment on its breach of contract claim as well as F + M's motion

for summary judgment on Bogosian's attorney malpractice counterclaim.

### C. F + M's Breach of Contract Claim

F + M objects to Magistrate Judge Boudewyns' recommendation that F + M's motion for summary judgment be denied on its breach of contract claim against Bogosian. Accordingly, the Court now undertakes a de novo review of F + M's motion. After reviewing the record and hearing arguments from the parties, the Court rejects Magistrate Judge Boudewyns' recommendation and finds that F + M is entitled to summary judgment on its breach of contract claim as a matter of law.

The facts essential to deciding this motion are not in dispute. The terms of the retainer letter and the assignment are clear from the record, and Bogosian admits that she signed these agreements. It is also undisputed that Bogosian has not paid F + M's legal fees and that when F + M notified Bogosian that WRC delivered the checks to F + M on her behalf she refused to indorse the checks and pay them over to F + M. Therefore, there is no factual dispute which requires resolution by a fact-finder. The only issue is whether, as a matter of law, the undisputed facts support F + M's claim for breach of contract.

F + M's motion for summary judgment on its breach of contract claim must be analyzed under principles of contract law which are well settled in Rhode Island. The Court must first consider whether an enforceable contract exists between F + M and Bogosian. In order for an agreement to be enforceable under contract law, the parties must manifest their objective intent to be bound. *UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp.*, 641 A.2d 75, 79 (R.I. 1994); *Smith v. Boyd*, 553 A.2d 131, 133 (R.I.1989). Such intent is manifested through one party's offer and the other party's acceptance of that offer. *Smith*, 553 A.2d at 133. When the offeror seeks acceptance through an act of performance or forbearance on the part of the offeree, the offeror proposes a unilateral contract. *Judd Realty, Inc. v. Tedesco*, 400 A.2d 952, 956 (R.I.1979). A unilateral contract consists of a promise made by one party in exchange for the performance of another party, and the promisor becomes bound in contract when the promisee performs the bargained for act. *B & D Appraisals v. Gaudette Machinery Movers, Inc.*, 733 F.Supp. 505, 508 (D.R.I. 1990). Accordingly, one party's promise to pay money to the other when certain services are to be rendered in the future becomes a unilateral contract when those services are performed. *Tedesco*, 400 A.2d at 956.

An executory unilateral promise is not enforceable under contract law unless it is supported by valid consideration. *Hayes v. Plantations Steel Co.*, 438 A.2d 1091, 1094 (R.I.1982). Consideration consists of some right, interest, or benefit flowing to one party or some forbearance, detriment, or responsibility undertaken by the other. *Id.* Valid consideration, that is, consideration which supports an enforceable unilateral contract, must be bargained for. *Id.* It must induce the other party's performance. *Id.* Therefore, in a unilateral contract, the promisee's performance serves as the consideration for the promisor's promise because it is detrimental to the promisee and flows to the benefit of the promisor.

In this case, an enforceable unilateral contract was formed between F + M and Bogosian. When Bogosian signed the retainer letter she promised to pay legal fees to F + M in exchange for F + M's future performance of legal services. F + M did in fact perform by providing extensive legal services to Bogosian over the span of more than three years. F + M, through its performance, accepted the offer made by Bogosian via the retainer letter. Additionally, F + M's performance was valid consideration for Bogosian's promise because it accrued to Bogosian's benefit and was induced by her promise to pay legal fees. Accordingly, Bogosian and F + M have an enforceable contractual relationship.

Having established the existence of the contract, the Court must now interpret its terms to determine its legal effect. Under Rhode Island law, the Court's objective in construing contractual language is to determine the parties' intent. *Johnson v.*

*Western Nat. Life Ins. Co.,* 641 A.2d 47, 48 (R.I.1994). If the terms of the contract are ambiguous, a question of fact exists which may only be resolved by a fact-finder. *Tedesco,* 400 A.2d at 955. However, if the terms of the contract are clear and unambiguous, the task of judicial construction is over and the Court will enforce those terms as they are written. *Kelly v. Tillotson–Pearson, Inc.,* 840 F.Supp. 935, 944 (D.R.I.1994); *Textron, Inc. v. Aetna Cas. & Sur. Co.,* 638 A.2d 537, 539 (R.I.1994). If the parties' intent can be clearly inferred from the terms of the contract as a whole, that intent must govern the Court's legal analysis. *Hill v. M.S. Alper & Son, Inc.,* 106 R.I. 38, 256 A.2d 10, 15 (1969). The legal effect of the contract's terms is then a question of law for the Court. *Hodor v. United Services Auto. Ass'n,* 637 A.2d 357, 359 (R.I.1994).

Whether the contract's terms are clear or ambiguous is a question of law for the Court. *Kelly,* 840 F.Supp. at 944. To determine whether the terms are ambiguous the Court must view the contract in its entirety and give its terms their plain, ordinary, and usual meaning. *Johnson,* 641 A.2d at 48. The contract is only ambiguous if it is reasonably and clearly susceptible to more than one interpretation. *W.P. Associates v. Forcier, Inc.,* 637 A.2d 353, 356 (R.I.1994). If only one interpretation is reasonably possible, then the intent of the parties as it is clearly expressed governs according to the ordinary dictionary meaning of the contract's terms. *Forcier,* 637 A.2d at 356; *Dudzik v. Leesona Corp.,* 473 A.2d 762, 765 (R.I.1984).

The contract between F + M and Bogosian is clear and unambiguous. The retainer letter dated November 24, 1989, sets out the terms of F + M's representation of Bogosian. After consulting with Pliakas, her personal counsel, Bogosian agreed to those terms. By the terms of the letter, Bogosian was to pay F + M a retainer of $25,000 to be held in escrow and applied against F + M's final billing. In exchange for F + M's representation of Bogosian, Bogosian agreed to pay legal fees based on the hourly rates of F + M's attorneys who worked on her behalf. She also agreed to pay for customary disbursements. Bogosian agreed that F + M would bill Bogosian on a monthly basis for its services and disbursements and interest would accrue at Fleet National Bank's prime rate on balances left unpaid for sixty days or more. These terms are unambiguous because they admit of only one reasonable interpretation. No genuine dispute exists as to these terms and their legal effect is clear: Bogosian has a contractual obligation to pay for the legal services which F + M rendered on her behalf as they are set out in F + M's monthly billings. This was clearly the intent of the parties when they entered into the agreement.

F + M alleges that as of June 9, 1994, the total fees, disbursements and interest owed by Bogosian to F + M pursuant to the November 24, 1989 letter were $1,079,282.30.[5] The amount of principal allegedly owed to F + M for services rendered, $906,931.45, was calculated based on the unpaid statements submitted by F + M to Bogosian from December 5, 1989 until May 5, 1993. Bogosian has offered no credible evidence to raise a genuine dispute as to the reasonableness of F + M's fees. F + M further alleges that as of June 9, 1994, Bogosian's total payments to F + M were $2531.25, exclusive of the $25,000.00 retainer held in escrow. There is no dispute that F + M provided extensive legal services to Bogosian in connection with numerous matters over a period of more than three years from December 1989 through April 1993. Under the clear terms of their contract, Bogosian is obligated to pay for those services and she has failed to do so. Although the retainer letter contemplated that Bogosian might lack sufficient resources to make timely payments of F + M's monthly bills, additional provision was made in the contract to allow Bogosian to satisfy her obligations out of the proceeds from pending litigation. It is her alleged failure to satisfy this provision which is the basis for F + M's claim for breach of contract.

---

**5.** F + M also alleges that interest has continued to accrue at Fleet National Bank's prime rate from June 9, 1994 to present.

The terms of the contract which are central to this dispute, both in their interpretation and their legal effect, are those by which Bogosian agreed to apply her "first proceeds" toward payment of F + M's legal fees. Specifically, Bogosian agreed:

> to apply [her] first proceeds out of the E & J receivership, the Woloohojian Realty Associates receivership, and/or the federal court litigation, until all of [F + M's] outstanding bills, including any accrued interest, are paid in full.

The crux of the parties' dispute over these terms concerns the meaning and effect of the words "first proceeds." However, giving these terms their plain and usual meaning, it is clear that no ambiguity exists. "Proceeds" are commonly defined as "the total amount brought in" or "the net amount received." *Webster's Ninth New Collegiate Dictionary* 937 (1986). Clearly, then, the parties intended the "first proceeds" to be the first amounts received by Bogosian in connection with those litigations.

F + M argues that Bogosian breached her contract with F + M because she failed to accept two checks totalling $1 million which were written by WRC on December 23, 1992, and were payable to Bogosian. F + M contends that the checks constituted "first proceeds" under its contract with Bogosian, and that she was contractually obligated to sign them and turn them over to F + M in payment of F + M's outstanding fees. Bogosian, on the other hand, argues that the checks were not the "first proceeds" because she did not accept them, but rather rejected them based on her good faith belief that she would suffer adverse tax consequences if she accepted them. She also alleges that she believed that the checks should not have been considered payment of the principal amounts owed to her by WRC.

The Court finds Bogosian's argument unpersuasive and agrees with F + M that the checks were indeed the "first proceeds." Accompanying the checks was a letter from WRC which identified the checks as "an immediate credit toward any principal sums which may become due and owing to Mrs. Bogosian in the federal court proceeding. . . ." The federal court proceeding referred to in the letter was *Elizabeth V. Bogosian v. James H. Woloohojian, et al.*, C.A. No. 88–0373–B, the same case referred to in both the retainer letter and the assignment as the "federal court litigation." In that case, Bogosian sought to recover the fair value of her shares of WRC stock in a valuation proceeding brought before Judge Boyle. The anticipated value of Bogosian's shares was approximately $4 million. To help Bogosian meet her day-to-day expenses, Judge Boyle ordered WRC to make interim payments to Bogosian while the valuation proceeding was pending. It is clear that the checks totalling $1 million were considered by WRC to be, and were in fact, proceeds from the federal court litigation. It is also clear that Bogosian had no right to reject the checks and her refusal to accept them and pay them over to F + M was a breach of her contractual obligations to F + M.

In the assignment which Bogosian executed on November 28, 1989, Bogosian assigned to F + M her "Recoveries" from the state court receivership actions involving Woloohojian Realty Associates and E & J Realty Associates, as well as the federal court action involving Woloohojian Realty Corporation. These "Recoveries" were assigned to F + M to the extent that any outstanding fees and expenses were owed to F + M. The Court analyzes the legal effect of this assignment under general principles of assignment law.

An assignment is a transfer by the assignor to the assignee of all interests and rights in the assigned property. *In re Apex Oil Co.*, 975 F.2d 1365, 1369 (8th Cir. 1992); *Herzog v. Irace*, 594 A.2d 1106, 1108 (Me.1991). A valid assignment is an absolute and irrevocable transfer of ownership. *In re Apex Oil Co.*, 975 F.2d at 1369. The assignment is valid if there is clear evidence of the assignor's intent to transfer her rights and if the subject matter of the assignment is described so that it is readily identifiable. *Berkowitz v. Haigood*, 256 N.J.Super. 342, 606 A.2d 1157, 1159 (1992). Here, the assignment which Bogosian executed clearly demonstrates her intent to transfer her interest in the "Recoveries" to F + M to the extent of F + M's outstanding bills. The subject

matter of the assignment, the "Recoveries", is clearly defined by the agreement itself as the sums which Bogosian anticipated receiving as a result of the enumerated litigations. Therefore, they are readily identifiable and are in fact identical to the "proceeds" identified in the retainer letter. It is generally held that a party's interest in anticipated proceeds from pending litigation is an assignable interest. *Berkowitz,* 606 A.2d at 1159; *Herzog,* 594 A.2d at 1109. Therefore, by executing the assignment, Bogosian transferred her entire interest in any future proceeds from those litigations to F + M up to the outstanding amount of the legal bills. Having so assigned the proceeds, Bogosian had no power to reject them. She was obligated to indorse the checks and pay them over to F + M. *See Berkowitz,* 606 A.2d at 1160; *Herzog,* 594 A.2d at 1109; 6 Am.Jur.2d *Assignments* § 105 (1963).

Because Bogosian was obligated under the terms of the assignment to accept the checks, indorse them, and remit them to F + M, her refusal to do so was a breach of her contractual obligations under the retainer agreement. Whether she had a good faith basis for her refusal is irrelevant. She had no legal basis for refusing, and, therefore, violated her contractual duty to pay F + M.

Bogosian has a contractual duty to pay F + M for the legal services it rendered in accordance with their agreement. Any nonperformance of a contractual duty constitutes a breach of contract. *Restatement (Second) of Contracts* § 235(2) (1979). This is so even where the party who fails to perform is not at fault. *Id.* at § 235 cmt. b. Therefore, under Rhode Island contract law, Bogosian is in breach of contract and she is required to place F + M in the position F + M would have enjoyed had Bogosian performed her contractual obligations. *See Russell v. Salve Regina College,* 890 F.2d 484, 489 (1st Cir. 1989), *rev'd on other grounds,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (citing *Rhode Island Turnpike and Bridge Auth. v. Bethlehem Steel Corp.,* 119 R.I. 141, 379 A.2d 344, 357 (1977)). Bogosian has offered no credible evidence to dispute either the reasonableness of F + M's outstanding fees or the accuracy of their calculation. Accordingly, F + M is entitled to summary judgment on its breach of contract claim. Pursuant to Fed.R.Civ.P. 56(d) the Court finds that the amount owed to F + M by Bogosian is $1,079,282.30, plus any interest which has accrued since June 9, 1994 on the principal amount. Judgment will be entered for F + M when a showing is made by F + M of Fleet's prime rate from June 9, 1994 to date of judgment and a final calculation is made.

**D. Bogosian's Attorney Malpractice Counterclaim**

The Court accepts Magistrate Judge Boudewyns' recommendation that summary judgment be granted for F + M on Bogosian's attorney malpractice counterclaim. Bogosian has failed to present the affidavit of any expert witness to support her allegation that F + M committed malpractice while representing her.

Under Rhode Island law, a party seeking to establish liability for attorney malpractice must prove that the attorney breached his or her duty to the client by failing to exercise "ordinary care and skill" in handling the client's legal affairs. *Focus Inv. Assoc., Inc. v. American Title Ins. Co.,* 992 F.2d 1231, 1239 (1st Cir.1993) (citing *Holmes v. Peck,* 1 R.I. 242, 245 (R.I.1849)). The claimant must also prove that the alleged breach was the proximate cause of her damages. *Scuncio Motors, Inc. v. Teverow,* 635 A.2d 268, 269 (R.I.1993). Therefore, to survive a motion for summary judgment, the claimant must produce competent evidence sufficient to raise a jury question as to the standard of care to which the attorney should be held, the scope of the attorney's duty to the client, the existence of a breach of that duty, and the damages to the claimant proximately caused by that breach.

No Rhode Island cases address the issue of what constitutes competent evidence in an attorney malpractice action. However, as the First Circuit found in *Focus,*

> While there is no Rhode Island case law addressing the issue of expert testimony in a legal malpractice case, a review of other jurisdictions indicates that the most widely accepted rule is that a legal malpractice

plaintiff must present expert testimony establishing the appropriate standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can resolve the issue as a matter of common knowledge. 992 F.2d at 1239.[6]

Cases which can be resolved based on a layperson's common knowledge are those where negligence is "clear and palpable" and where the fact finder need not analyze the attorney's exercise of legal expertise. *Focus,* 992 F.2d at 1239. However, if the attorney's legal expertise is at issue, "a jury cannot rationally apply negligence principles to professional conduct absent evidence of what the competent lawyer would have done under similar circumstances...." *Focus,* 992 F.2d at 1239 (quoting *Lenius v. King,* 294 N.W.2d 912, 914 (S.D.1980)). In such cases, where expert evidence is required but not adduced, summary judgment for the defendant attorney is appropriate as a matter of law. *See Focus,* 992 F.2d at 1240.

Examining the substance of Bogosian's counterclaim, it is clear that jurors could not rely on their common sense to determine whether F + M committed malpractice. Bogosian does not allege, for example, that F + M failed to file an action on her behalf within a statute of limitations; a situation where negligence would be "clear and palpable." *See Focus,* 992 F.2d at 1239. Rather, her allegations implicate F + M's application of its legal expertise and discretion to complex issues spanning several litigations. Therefore, Bogosian's counterclaim cannot survive F + M's motion for summary judgment unless her opposition to the motion is supported by the affidavit of an expert who possesses "special knowledge, skill or information about the subject matter acquired by study, observation, practice or experience...." *See Morgan v. Washington Trust Co.,* 105 R.I. 13, 249 A.2d 48, 51 (1969).

F + M filed its motion for summary judgment with the Court on October 5, 1994. In her objection to F + M's motion, filed on October 22, 1993, Bogosian argued, incorrectly, that expert testimony was not required to prove her counterclaim because F + M's negligence was clear and could be determined by the fact finder as a matter of common knowledge. No expert affidavits were offered by Bogosian in opposition to F + M's motion, and no expert witness had been identified at that time, even though discovery closed on September 24, 1993.

In the memorandum which she filed with the Court on February 15, 1994, Bogosian attached supplemental responses to F + M's interrogatories, also dated February 15, indicating that she expected to call J. Ronald Fishbein ("Fishbein"), a Providence attorney, to testify as an expert at trial. Bogosian did not identify the expected substance of Fishbein's testimony, but stated generally that, "It is anticipated that the expert will testify in support of the defenses raised to your Complaint, and in support of all of the allegations raised against you in the ... Counterclaim." As of February 22, 1994, when Magistrate Judge Boudewyns heard oral arguments on the parties' cross-motions for summary judgment, no expert evidence had been presented by Bogosian. Following the February 22 hearing, F + M filed the deposition of Pliakas pursuant to Magistrate Judge Boudewyns' order. Bogosian cited portions of Pliakas' testimony in support of her counterclaim. The Court agrees with Magistrate Judge Boudewyns' assessment, however, that Pliakas' deposition testimony does not constitute competent expert evidence in support of Bogosian's malpractice counterclaim. Therefore, no expert evidence was submitted by Bogosian in opposition to F + M's motion for summary judgment on the counterclaim.

As a result, Bogosian has failed to establish that a genuine issue of material fact exists as to either the scope of the duty owed by F + M to Bogosian or as to F + M's alleged breach of that duty. Additionally, Bogosian has presented no competent evidence to support her claim for damages for injuries she allegedly suffered as a result of F + M's supposed negligence. It is well established under Rhode Island law that a

---

**6.** *See also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32, at 188–89 (5th ed. 1984); *Marshall v. Tomaselli,* 118 R.I. 190, 372 A.2d 1280, 1283 (1977) (in analogous context, Rhode Island Supreme Court held expert evidence required in medical malpractice actions except where lack of care so obvious as to be within layperson's common knowledge).

claimant must prove she is entitled to damages based on legally competent evidence, not merely speculation or conjecture. *See, e.g., Troutbrook Farm, Inc. v. DeWitt,* 611 A.2d 820, 824 (R.I.1992); *Alterio v. Biltmore Const. Corp.,* 119 R.I. 307, 377 A.2d 237, 240–41 (1977). Bogosian has failed to present any such evidence, expert or otherwise. Accordingly, under the standard set out in *Focus,* F + M is entitled to summary judgment on Bogosian's counterclaim as a matter of law.

Although Bogosian's counterclaim includes two counts—Count I alleges negligence and Count II alleges breach of contract—both counts rely on the same factual allegations of attorney malpractice. It is well established that a claim of attorney malpractice implicates both tort and contract law. *See* 7A C.J.S. *Attorney & Client* § 255 (1980). It is the contractual relationship between the parties which gives rise to the duty of care owed by the attorney to the client, and therefore an allegation of legal malpractice gives rise to claims sounding in both tort and breach of contract. *Id.* However, both legal theories depend on the same factual allegations of malpractice. In this case, it is the contractual relationship between F + M and Bogosian which gave rise to F + M's duty to exercise reasonable care in handling Bogosian's legal affairs. Because Bogosian is unable to prove that F + M violated the duty of care, she is likewise unable to prove that F + M breached the underlying contract. Therefore, F + M is entitled to summary judgment on both. Count I and Count II of Bogosian's counterclaim for attorney malpractice.

**E. Bogosian's Rule 56(f) Request**

 In her objection to Magistrate Judge Boudewyns' Report and Recommendation, Bogosian invokes Fed.R.Civ.P. 56(f) and requests this Court to either dismiss the plaintiff's motion for summary judgment on her malpractice counterclaim, without prejudice, or grant a continuance to allow her additional time to obtain expert testimony to stave off summary judgment. The Court declines to pursue either tack.

Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Rule 56(f) is a "procedural escape hatch" designed to aid parties who genuinely need additional time to gather facts in support of their opposition to summary judgment. *Paterson–Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 988 (1st Cir.1988). Although courts generally apply the rule liberally, it need not be employed to spare litigants from their own lack of diligence. *Hebert v. Wicklund,* 744 F.2d 218, 222 (1st Cir.1984). As the First Circuit noted in *Resolution Trust Corp. v. North Bridge Associates, Inc.,* the rule is "designed to minister to the vigilant, not to those who slumber upon perceptible rights." 22 F.3d 1198, 1203 (1st Cir.1994). Neither should it be permitted to function as a stalling tactic. *See id.* Accordingly, the First Circuit in *Resolution Trust* enumerated five factors to guide district courts in exercising their discretion when considering an affidavit which invokes Rule 56(f) in an effort to conduct further discovery. These factors are: 1) the authoritativeness of the affidavit; 2) the timeliness of the affidavit; 3) whether the party opposing summary judgment has demonstrated good cause for its failure to discover facts essential to its opposition; 4) the utility of granting the continuance or denying summary judgment to allow the non-movant more time; and 5) the materiality of the facts sought by the non-moving party. *Resolution Trust,* 22 F.3d at 1203. In this case, the Court's application of two of these factors proves fatal to Bogosian's effort to invoke Rule 56(f).

 First, Bogosian's affidavit seeking the refuge of Rule 56(f) was untimely. Under the *Resolution Trust* framework a party must invoke Rule 56(f) within a reasonable time after the summary judgment motion is filed. 22 F.3d at 1204. In *Paterson–Leitch,* a case procedurally similar to that now be-

fore this Court, the First Circuit noted that "it is difficult to envision that a request first made after the conclusion of oral argument could be considered as seasonable." 840 F.2d 985, 988 (1st Cir.1988). Here, as in *Paterson–Leitch*, Bogosian failed to invoke Rule 56(f) until after Magistrate Judge Boudewyns had heard oral argument and recommended that her counterclaim be disposed of via summary judgment. Bogosian's Rule 56(f) affidavit was dated April 22, 1994, and filed along with her objections to the Magistrate's Report and Recommendation. As the First Circuit noted in *Resolution Trust*, use of Rule 56(f) "requires due diligence both in pursuing discovery before the summary judgment initiative surfaces and in pursuing an extension of time thereafter." 22 F.3d at 1203. Under this standard, Bogosian's attempt to invoke Rule 56(f) in an effort to obtain additional time to procure expert testimony was clearly untimely.

■ Second, Bogosian has failed to demonstrate good cause for her failure to obtain the expert evidence necessary to her counterclaim. Whether a litigant has demonstrated good cause must be viewed against the historical background of the litigation. *Resolution Trust*, 22 F.3d at 1205. More than eleven months passed from the time Bogosian filed her counterclaim for attorney malpractice on March 16, 1993, until Magistrate Judge Boudewyns heard oral arguments on the parties cross-motions for summary judgement on February 22, 1994. Although discovery closed on September 24, 1993, Bogosian failed to even identify an expert witness until February 15, 1994, when she filed a memorandum in opposition to F + M's motion for summary judgment to which her supplemental responses to F + M's interrogatories were attached as an exhibit. In her Rule 56(f) affidavit dated April 22, 1994, Bogosian states that she was unable to find an expert willing or able to testify until her counsel located and hired Fishbein in February 1994. Bogosian explains that,

because the files involved in her malpractice counterclaim against F + M are voluminous, Fishbein requires an unspecified amount of time to form an opinion about her claim. Appended to Bogosian's memorandum in support of her objections to Magistrate Judge Boudewyns' Report and Recommendation is the affidavit of Michael J. McGovern ("McGovern"), the lawyer who represented Bogosian in connection with this case until he withdrew his appearance in November 1993. McGovern states generally that he interviewed several Rhode Island lawyers but was unable to find anyone willing to serve as an expert witness on Bogosian's behalf. McGovern also recites several reasons why lawyers were unwilling to provide testimony. Neither Bogosian's nor McGovern's affidavit is convincing. As the Third Circuit observed in *Koplove v. Ford Motor Co.*,

> a party taking the position that nine months is an inadequate period in which to obtain and file an expert's report has an obligation to provide the court with a record which affirmatively demonstrates, with specificity, diligent efforts on his or her part and unusual circumstances which have frustrated those efforts. 795 F.2d 15, 18 (3rd Cir.1986) (affirming the district court's granting of summary judgment and rejection of a Rule 56(f) affidavit).

Neither Bogosian's nor McGovern's affidavit offers persuasive support for Bogosian's last-ditch effort to ward off summary judgment on her counterclaim. During the months preceding Magistrate Judge Boudewyns' summary judgment hearing, Bogosian filed two more substantial lawsuits involving the ongoing disputes over her family's real estate ventures.[7] It is apparent that Bogosian and McGovern's allegedly "diligent" search for an expert witness to testify in this case took a back seat to Bogosian's other numerous legal initiatives. As the First Circuit has consistently re-affirmed, this Court should not use Rule 56(f) to save a litigant from her own lack of diligence.

---

7. The two additional suits filed by Bogosian were: *Elizabeth V. Bogosian v. James Woloohojian*, C.A. No. 93–0358–L, filed in this Court on July 2, 1993; and *Elizabeth V. Bogosian v. James H. Woloohojian; Menas Peter Woloohojian; Rhode Island Housing Mortgage and Finance Cor-*

*poration; Woloohojian Realty Corp.; Harwol Construction Co., Inc.; Harwol Properties, Inc.; and Does 1–12*, KC93–0759, a 77–page complaint filed in Kent County Superior Court on August 25, 1993.

Accordingly, Bogosian's request that F + M's motion for summary judgment on the counterclaim be either denied without prejudice or continued under Rule 56(f) is denied. Because Bogosian has failed to present any competent expert evidence in support of her attorney malpractice counterclaim, the Court grants summary judgment in favor of F + M on both Count I and Count II of the Counterclaim.

## IV. *CONCLUSION*

For the foregoing reasons, the Court grants F + M's motion for summary judgment on its breach of contract claim against Bogosian. Therefore, Bogosian's motion for summary judgment on F + M's breach of contract claim is denied. Because Bogosian has failed to introduce any competent evidence to dispute either the amount or the reasonableness of F + M's fees, pursuant to Fed.R.Civ.P. 56(d) the Court finds that the amount owed to F + M under the contract is $1,079,282.30, plus any interest which has accrued since June 9, 1994. Finally, the Court grants F + M's motion for summary judgment on both Count I and Count II of Bogosian's Counterclaim alleging attorney malpractice because she has failed to present any expert testimony in support of her counterclaim.

The Court will schedule a hearing to determine the precise amount of the judgment to be entered for F + M on the Complaint. Until that hearing is held no judgments will enter.

It is so ordered.